753 A.2d 1024

SECRETARY OF PUBLIC SAFETY AND
CORRECTIONAL SERVICES

v.

Thomas HUTCHINSON.

No. 148, Sept. Term, 1999.

Court of Appeals of Maryland.

June 23, 2000.

Michael O. Doyle, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on the brief), Baltimore, for petitioner.

Stephen Z. Meehan (David C. Wright and Joseph B. Tetrault, on the brief), Chestertown, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

WILNER, Judge.

We explore once again the arcane world of diminution credits available to prisoners in the State correctional system. *See Moats v. Scott,* 358 Md. 593, 751 A.2d 462 (2000); *Secretary, Dept. of Public Safety and Correctional Services v. Henderson,* 351 Md. 438, 718 A.2d 1150 (1998); *Beshears v. Wickes,* 349 Md. 1, 706 A.2d 608 (1998); *Md. House of Correction v. Fields,* 348 Md. 245, 703 A.2d 167 (1997). The question is whether an inmate who (1) by virtue of accumulated diminution credits is released on mandatory supervision, prior to the expiration of his sentence(s), (2) while on mandatory supervision commits a new crime, for which he receives a new sentence, and (3) is returned to prison to serve both the remaining part of the original sentence(s) and the new sentence, is entitled to good conduct credits against the new

sentence from the time of its effective date or only from the time the original sentence(s) expires.

The dispute between the Secretary of Public Safety and Correctional Services and the Division of Correction (DOC), on the one hand, and Thomas Hutchinson, on the other, hinges on the proper construction of Maryland Code, § 7–504(b) of the Correctional Services Article, which states, simply, that "[a]n inmate may not be awarded any new diminution credits after the inmate's mandatory supervision has been revoked."

## PROCEDURAL HISTORY

Thomas Hutchinson is no stranger to the Division of Correction; he has been a frequent guest in its facilities, beginning in 1970, when he was convicted of robbery with a deadly weapon and sentenced to 20 years. In 1973, he escaped, which landed him an additional seven years when he was apprehended two years later. He was paroled in February, 1982, but was returned 11 months later, with an additional 10–year sentence, upon his conviction for assault with intent to murder. In October, 1991, after being convicted of assault with intent to maim, he was given a three-year sentence, with all but three months suspended.

Hutchinson was released on mandatory supervision in May, 1993. Three months later, he was arrested for possession with intent to distribute heroin, of which he was eventually convicted and sentenced to seven years, commencing upon his arrest on August 23, 1993. In June, 1994, the Parole Commission formally revoked his mandatory supervision, allowed him no "street time," and rescinded 613 diminution credits. As a result of the new sentence and the action of the Parole Commission, the maximum expiration date of Hutchinson's term of confinement was calculated to be August 23, 2000. All of this is prologue.

Hutchinson was released, once again, on mandatory supervision in August, 1995. Any hope that he had somehow been habilitated was dashed when, on February 29, 1996, he was convicted of possession with intent to distribute cocaine, for

which he received a 20–year sentence, with all but five years suspended. It is the fallout from that conviction and sentence that produced this appeal. In June, 1996, the Parole Commission revoked Hutchinson's mandatory supervision, rescinded all of his 1,568 days of good conduct credits, and allowed him only 61 days of "street time." By virtue of those actions, Hutchinson's maximum expiration date with respect to the sentences he was serving when placed on mandatory supervision became February 15, 2001. Against that date, DOC applied 132 work and special project credits, which resulted in a new mandatory supervision release date of October 6, 2000. Later, DOC allowed some additional credits that moved the mandatory supervision release date to September 1, 2000.

The full extent of the dispute between Hutchinson and DOC appears to involve an intricate series of calculations not fully explained in either the record extract or the briefs, but the heart of the dispute concerns the extent to which Hutchinson is entitled to good conduct diminution credits against the new five-year sentence, which would end on February 28, 2001. DOC takes the position that, by virtue of § 7–504(b), Hutchinson is not entitled to any good conduct credits against the five-year sentence until he has served, in full, the term of confinement he was serving when placed on mandatory supervision. Under that approach, as best we can determine, he would not begin to receive good conduct credits against that sentence until September 1, 2000—the mandatory supervision release date applicable to the "old" sentences.

Hutchinson, on the other hand, maintains (1) that he is entitled to 92 additional days of work and special project credits against the "old" sentences, which presumably would move the mandatory release date applicable to those sentences back to the end of June, 2000, and (2) that he is entitled to good conduct credits at the rate of five days a month against the five-year sentence from the time it was imposed, on February 29, 1996, which, according to his calculation, would yield an additional 290 days of credits.

In October, 1996, Hutchinson filed a grievance with the Inmate Grievance Office, complaining about DOC's calculations. His grievance was rejected by the warden, by the Commissioner of Correction, and by an administrative law judge. He then sought judicial review in the Circuit Court for Washington County, which affirmed the ruling of the ALJ. The Circuit Court concluded that "a prisoner whose mandatory supervision has been revoked, cannot earn any new diminution credits either on that portion of the sentence that he must serve resulting from rescission of supervision as well as any new sentence imposed to be served concurrently with his former sentence." The court held that such a prisoner would begin to earn diminution credits on a subsequent sentence only "upon the completion of the maximum expiration date of the term of confinement for which mandatory supervision had been revoked."

Aggrieved, Hutchinson appealed to the Court of Special Appeals which, in an unreported opinion filed February 11, 2000, reversed the judgment of the Circuit Court. The intermediate appellate court found § 7–504(b) to be ambiguous with respect to whether diminution credits were allowed or disallowed against any new sentence and, applying the rule of lenity, concluded that the statute did not bar credits on subsequently imposed, concurrently executed sentences. It therefore held that DOC erred in refusing to award good conduct credits from February 29, 1996. It also held that DOC erred in refusing to credit Hutchinson with the 92 work and special project credits he had earned from December, 1993 through August, 1995. In light of those holdings, the court directed a remand to the Secretary of Public Safety and Correctional Services for an immediate recalculation of Hutchinson's mandatory supervision release date. The case was returned and, on February 16, 2000, DOC released Hutchinson from confinement. The basis on which it concluded that Hutchinson was entitled to immediate release is not in the record before us and has not been explained to us by the parties.

Complaining that the Court of Special Appeals decision, even though unreported, affects the mandatory supervision release dates of between 2,000 and 3,000 other inmates, the Secretary of Public Safety and Correctional Services sought our review of that court's construction of § 7–504(b). The Secretary did not complain about the intermediate appellate court's conclusion regarding the 92 days of work and special project credits, which applied to the old sentences, but only whether § 7–504(b) permitted "an award of credits for time to be served on a concurrent sentence imposed after release on mandatory supervision which overlaps with time the inmate is required to serve on the original, reinstated term of confinement." We granted *certiorari* to review that limited question.

## DISCUSSION

The Legislature first authorized good conduct diminution credits in 1876. By 1876 Md. Laws, ch. 162, it provided that convicted prisoners serving sentences in the penitentiary were entitled to have deducted from their sentences five days for each calendar month during which no charge of misconduct had been sustained. The law also required that prisoners be discharged at the expiration of their sentence less the time so deducted. As we pointed out in *Moats, Henderson, Wickes,* and *Fields,* over the years the Legislature provided for three other kinds of credits as well—for performing work tasks (five days a month), for satisfactory progress in vocational or other educational courses (five days a month), and for special work projects (up to ten days a month). The work, educational, and special project credits are awarded monthly, as earned. Good conduct credits, however, are deducted in advance from the inmate's term of confinement, subject to being rescinded if the inmate misbehaves in various ways.

Until 1970, prisoners released early, through the accumulation of credits, were treated as though they had effectively served their entire sentence; they were not subject to any special restrictions or encumbrances upon release. In 1970, the Legislature changed that situation and provided that persons sentenced after July 1, 1970, who were released early

by reason of accrued diminution credits were to be "deemed as if released on parole until the expiration of the maximum term or terms for which [they were] sentenced." 1970 Md. Laws, ch. 406. The law provided further that such prisoners were subject to all laws, rules, regulations, and conditions applicable to parolees and were to remain under the supervision of the Division of Parole and Probation until the expiration of the maximum term.

Notwithstanding the broad language of the 1970 Act, there was apparently some question as to the extent of the Parole Commission's authority over prisoners so released, especially over whether any special, individual conditions could be imposed. *See* Senate Judicial Proceedings Committee Bill Analysis and Department of Public Safety and Correctional Services Position Statement on Senate Bill 103 (1989). To address that perceived ambiguity, the General Assembly enacted 1989 Md. Laws, ch. 307, which, among other things, defined the status of inmates released early through the accumulation of diminution credits as "mandatory supervision," required that each person on mandatory supervision be issued a written order specifying the terms and conditions that must be met, and directed the Division of Parole and Probation to supervise the person until the expiration of the maximum term of the sentence.

The 1989 Act also, for the first time, addressed the consequences of violating a condition of mandatory supervision. It continued the language of the 1970 law that made persons on mandatory supervision subject to all laws and regulations applicable to parolees, which, at least implicitly, contemplated a revocation of mandatory release status by the Parole Commission if the person violated the conditions of the release. The Act then specified, in a rewritten § 4–612 to Article 41 of the Code:

"(e) The Parole Commissioner presiding may rescind all diminution credits previously earned on the sentence or any portion thereof in the revocation proceedings.

(f) A person under mandatory supervision may not earn any new diminution credits once the mandatory supervision has been revoked."

These various provisions are now codified in §§ 7–501, 7–502, and 7–504 of the Correctional Services Article. Section 7–501 requires the Division of Correction to grant "a conditional release from confinement" to an inmate who (1) is serving a term of confinement of 12 months or more imposed after July 1, 1970, and (2) has served the term less diminution credits awarded under other provisions of the law. That conditional release is defined in § 7–101(g) as "mandatory supervision." Section 7–502 makes clear that a person on mandatory supervision remains in legal custody until the expiration of his or her full term and is subject to all laws, rules, regulations, and conditions applicable to parolees as well as to any special conditions established by a member of the Maryland Parole Commission.

Sections 4–612(e) and (f), as enacted in 1989, are now codified in § 7–504 of the Correctional Services Article. As we indicated earlier, § 7–504(b) provides that "[a]n inmate may not be awarded any new diminution credits after the inmate's mandatory supervision has been revoked."

The parties are in agreement that § 7–504(b) precludes the award of any future diminution credits against the sentence(s) the inmate was serving when placed on mandatory supervision. The question is whether it also precludes the award of credits against any new sentence imposed. Paradoxically, neither party regards § 7–504(b) as ambiguous, notwithstanding that they each have very different, and contradictory, views of what it means. As we indicated, DOC believes that diminution credits *may* be awarded against a new sentence, but not until the "old" sentence has been fully served. Hutchinson urges that credits may be awarded against the new sentence from the time of its imposition. Because, under § 3–701 of the Correctional Services Article, all sentences being served are aggregated into one term of confinement, commencing on the first day of the sentence that begins first and

ending on the last day of the sentence ending last, he would effectively apply those credits awarded against the new sentence to the entire term of confinement, which would have the effect of applying them to the "old" sentence as well. That approach, the Secretary complains, would lead to the absurd result of an inmate who commits a new crime and receives a new sentence while on mandatory supervision serving less time upon revocation of the mandatory supervision than an inmate who does not commit a new crime and receives no new sentence but whose mandatory supervision is revoked for other reasons.

We think that both approaches, as presented, are flawed. There is a way to read § 7–504(b) in a common sense way, consistently with the views we expressed in *Moats* and *Henderson,* and that carries out what we think was the legislative intent without presenting the anomaly posited by the Secretary.

We begin by noting the obvious. Neither § 7–504(b) nor any other statute that can be read in context with it clearly states, one way or the other, whether the prohibition applies to new sentences after an inmate is released on mandatory supervision. The statute itself is silent in that regard. The 1989 legislation that first enacted the provision was a departmental bill sponsored by the Department of Public Safety and Correctional Services in order, as we indicated, to clarify the authority of the Parole Commission to supervise persons on mandatory supervision, and there is nothing in the legislative history of that enactment that sheds any light on the issue now before us.

If there is an inference to be drawn, it would arise from reading former §§ 4–612(e) and (f)—current §§ 7–504(a) and (b)—together, in light of the circumstances existing at the time of their enactment. Section 4–612(e)—current § 7–504(a)—permits the Parole Commission, upon revocation of mandatory supervision, to rescind all diminution credits previously earned, which can only apply to the sentence(s) being served when the inmate was placed on mandatory supervision.

Section 4–612(f)—current § 7–504(b)—can then be read as complementing that provision by making clear that no new credits may be applied against *that sentence.* It is not always the case that there will be a new sentence, and it is reasonable to infer that the Legislature's focus was only on the sentence still being served by the inmate while on mandatory supervision. The penalty for violating a condition of mandatory supervision was service in full of the existing sentence. That approach is fully consistent with the fact that, when the provision was first enacted in 1989, the law did not aggregate multiple sentences into a single term of confinement but regarded them as separate and independent. The aggregation of multiple sentences into a single term of confinement was not authorized until 1991. *See* 1991 Md. Laws. ch. 354. If the Legislature, in 1989, had intended that the prohibition against future diminution credits apply to any sentence other than the one the inmate was serving when placed on mandatory supervision, it likely would have said so.

That was certainly the view, in 1999, of the Correctional Services Article Review Committee, selected by the General Assembly's Legislative Policy Committee to superintend the code revision of the correctional services laws. The Revisor's Note to § 7–504 states, in relevant part:

"The Correctional Services Article Review Committee notes, for consideration by the General Assembly, that subsection (b) of this section seems to establish a prohibition against awarding an inmate diminution credits on any sentence after mandatory supervision has been revoked. However, the Committee assumes that subsection (b) was intended to apply only to the sentence or sentences for which the inmate was awarded diminution credits prior to release on mandatory supervision and not to a new sentence for a crime committed while the inmate was on mandatory supervision. The General Assembly may wish to amend subsection (b) to state expressly that an inmate may not be awarded any diminution credits 'on the sentence or sentences for which the individual was awarded diminution credits prior to release on mandatory supervision.' The General Assembly

may also wish to clarify how good conduct credits should be calculated for a new sentence for a crime committed while an inmate was on mandatory supervision, depending on whether all or part of the new sentence runs concurrent with or consecutive to the sentence or sentences for which the inmate was awarded diminution credits before release on mandatory supervision."

Unfortunately, the General Assembly chose not to address the matter, perhaps in the belief that the interpretation suggested by the Correctional Services Article Review Committee was correct and that no clarification was necessary. Clarification *is* necessary, however, and it falls to us to provide it.

As we learned from *Fields, Wickes, Henderson,* and *Moats,* with an increasing number of prisoners serving multiple sentences—some concurrent, some consecutive, some imposed at the same time, some imposed at different times, some imposed before certain legislative enactments affecting diminution credits, some imposed after those enactments—rules governing diminution credits will affect different prisoners in different ways. A construction that will benefit one group will often hurt another group. A result that appears quite reasonable in one circumstance may appear to be unreasonable in another. The issue, ultimately, is one of legislative intent.

One thing that seems abundantly clear is that the General Assembly did not intend for there to be any future diminution credits applied against the sentence(s) the inmate was serving when placed on mandatory supervision. Hutchinson's approach, founded on the premise of a single term of confinement, would effectively do that, which is why we reject it. Just as in *Fields* and *Wickes* we subordinated the general direction to aggregate multiple sentences into a single term of confinement when to do otherwise would have denied inmates the benefit of a law that the General Assembly intended be applicable to them, so in this case we must do the same in order to carry out the predominant legislative intent. For purposes of applying § 7–504(b), the existing sentence(s), on

the one hand, and any new sentence(s), on the other, must be considered separately.

■ On that premise, the Secretary's position also fails to carry out the legislative intent, for it would deny prisoners the full benefit of the laws (§§ 3–702, and 3–704 through 3–707) allowing diminution credits against the new sentence(s). Inmates are entitled to begin earning good conduct credits upon imposition of the sentence and they are eligible for the other credits as they engage in the requisite programs or projects.

■ There is a way in which the legislative intent can be fairly implemented. Prisoners who receive a new sentence(s) for conduct committed while on mandatory supervision should receive, and must be given, good conduct credits on that sentence(s) as though there were no existing sentence(s). They are also eligible for work, education, and special project credits against that sentence(s). Those credits apply only to the new sentence(s), however. The prisoner gets no benefit from them with respect to the existing sentence, which he or she must serve in full, subject only to whatever preexisting credits are appropriately allowed against that sentence(s). Thus, even if the prisoner would be otherwise entitled to mandatory supervision release on the new sentence(s) prior to expiration of the old sentence(s), the prisoner may not be released until he or she has served the full extent of the old sentence. This approach, we believe, implements the full legislative intent. If the balance of the existing sentence that must be served in full is considerably longer than the new sentence, the prisoner will likely receive little or no real benefit from the credits applied to the new sentence, but that simply gratifies the intent of § 7–504(b). If, on the other hand, the new sentence(s) is more proportional to or is longer than the balance of the old sentence(s), the prisoner *will* get the benefit of the credits applied to that new sentence(s).

As we indicated, the mandate of the Court of Special Appeals effected a reversal of the judgment of the Circuit Court and directed a remand to the Secretary to recalculate Hutchinson's credits in accordance with the Court of Special

Appeals opinion. We agree that the judgment of the Circuit Court must be reversed and that the case must be remanded to the Secretary for recalculation of Hutchinson's credits and mandatory supervision release date, but that recalculation must be in accordance with this opinion, not that of the Court of Special Appeals.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF CIRCUIT COURT FOR WASHINGTON COUNTY AND REMAND CASE TO THAT COURT FOR REMAND TO PETITIONER FOR RECALCULATION OF RESPONDENT'S MANDATORY SUPERVISION RELEASE DATE IN ACCORDANCE WITH THIS OPINION; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.