9 A.3d 25

**J. Michael STOUFFER**

v.

**Eric HOLBROOK.**

**No. 25, Sept. Term, 2010.**

Court of Appeals of Maryland.

Nov. 22, 2010.

Michael O. Doyle, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for petitioners.

Joseph B. Tetrault (Stephen Z. Meehan of Prisoner Rights Information System of Maryland, Inc., Chestertown, MD),on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, BARBERA, JJ.

Opinion by HARRELL, J.

This case is about the calculation of diminution credits, a topic that strikes dread into the hearts of many trial and

appellate judges.[1] Fortunately, the panel of the Court of Special Appeals that decided the present case was not terrorized by it and pulled a laboring oar in fashioning a fine opinion. We follow in their wake. For many of the same reasons explained by our appellate brethren, we conclude that Petitioner, the Division of Correction ("the Division"), should have awarded Respondent, Eric Holbrook, good-conduct credits at the rate of ten, rather than five, days a month. Thus, we affirm.

## I.

The facts accompanying this case, typical of reported cases involving disputes over diminution credits, are extensive, as Holbrook is "no stranger to the Division of Correction." *Sec'y of Pub. Safety and Corr. Servs. v. Hutchinson,* 359 Md. 320, 322, 753 A.2d 1024, 1025 (2000). The year of 1999 was a busy one for Holbrook. In the Circuit Court for Wicomico County, he was convicted of several non-violent, non-drug offenses. At about the same time, he was convicted also for distributing cocaine. This latter offense, because it involved drugs, is of some importance to this case, a point we shall return to later. These 1999 convictions resulted in combined sentences, including active and suspended time, that expired on 5 May 2009. The lone drug offense, however, expired much sooner—on 20 October 2003.

In April 2003, Holbrook was released on parole and, while on parole, committed an assault in the second degree. According to Maryland Code (2002), Criminal Law Article, § 14-101, second degree assault is not a crime of violence,[2] another

---

**1.** For example, Professor Ester promised me that, if I finished law school and passed the Bar examination, there would be no more math. He was mistaken.

**2.** Under Section 14–101(a)(19)–(24), crimes of violence include assault in the first degree, assault with intent to murder, assault with intent to rape, assault with intent to rob, assault with intent to commit a sexual offense in the first or second degree, but *not* assault in the second degree.

fact that becomes especially pertinent in our analysis to follow. Nonetheless, the Circuit Court found that the assault constituted a violation of the terms and conditions of Holbrook's parole. As a result of the parole violation, on 5 May 2006, the court ordered Holbrook to serve five years of "back-up" time. *See Benedict v. State,* 377 Md. 1, 8, 831 A.2d 1060, 1064 (2003) ("If the defendant violates the probation .... [t]he court does not ... impose or reimpose the sentence"; it "merely determines how much of the unserved part of the sentence the defendant must serve in prison."). For the second degree assault conviction, the court sentenced Holbrook, on 14 November 2006, to a three year term, to run consecutively to the back-up time.

While re-incarcerated, Holbrook earned certain diminution credits against his original, pre-parole sentences. The computation of those credits is not at issue here. Trouble arose, however, with the 598 good-conduct credits Holbrook earned against his new, post-parole sentence for second degree assault (computed originally at the time at a rate of ten credits per month). Sometime after May 2007, the Division disallowed half of these credits, reducing them to 299. The Division claimed that, under Md.Code (1999, 2008 Repl.Vol.), Corr. Servs. Art. (CS), §§ 3–701 [3] and 3–704(b)(2),[4] Holbrook should have received just five credits a month.

---

3. CS § 3–701 provides:

> In this subtitle, "term of confinement" means:
> (1) the length of the sentence, for a single sentence; or
> (2) the period from the first day of the sentence that begins first through the last day of the sentence that ends last, for:
> (i) concurrent sentences;
> (ii) partially concurrent sentences;
> (iii) consecutive sentences; or
> (iv) a combination of concurrent and consecutive sentences.

4. CS § 3–704(b)(2) provides:

> If an inmate's term of confinement includes a consecutive or concurrent sentence for a crime of violence as defined in § 14–101 of the Criminal Law Article or a crime of manufacturing, distributing, dispensing, or possessing a controlled dangerous substance in violation of §§ 5–602 through 5–609, § 5–612, or § 5–613 of the Criminal

When a defendant is convicted of multiple crimes, multiple sentences may result. For purposes of determining the actual period of imprisonment, however, these sentences typically are aggregated into a single "term of confinement," defined as "the period from the first day of the sentence that begins first through the last day of the sentence that ends last." CS § 3–701. If the term of confinement includes a violent or drug-related offense, the defendant may earn only five, as opposed to ten, good-conduct credits a month. *See* CS § 3–704(b)(2). That is true even if the majority of the other offenses are unrelated to violence or drugs.

To justify disallowance of the higher rate of accrual in the present case, the Division reasoned that Holbrook served a single, continuous term of confinement because he was never outside its custody or supervision completely. Thus, the single term of confinement included the sentence for the 1999 drug-related crime (distributing cocaine). The Division concluded, on this basis, that Holbrook was entitled only to the lesser accrual rate of five good-conduct credits a month. In reply, Holbrook charged that the Division used improperly the ambiguous statutory definition of the phrase "term of confinement" as a "device" to deny him the more favorable rate.

Holbrook sought habeas corpus relief from the Circuit Court for Baltimore City. That Circuit Court found significant that the actual sentence for the 1999 drug conviction—the conviction and sentence upon which the Division relied to disqualify Holbrook from receiving ten good-conduct credits a month—had expired. Consequently, the court concluded that it was improper for the Division to include that conviction in the calculus of the relevant term of confinement. It ordered the Division to restore the revoked credits.

On the Division's appeal, the Court of Special Appeals, in an unreported opinion, affirmed. *J. Michael Stouffer, Commissioner of Correction, et al. v. Eric Holbrook,* No. 2708,

Law Article, the deduction described in subsection (a) of this section shall be calculated at the rate of 5 days for each calendar month.

September Term, 2008 (Md.Ct.Spec.App. February 5, 2010) (Rodowsky, J.). After conducting an extensive canvass of diminution credits jurisprudence (mostly cases of this Court), the intermediate appellate court did not find particularly meaningful the expiration of the sentence on the drug conviction. Rather, it concluded that the "predomina[nt] legislative intent, under the rule of lenity" demands that "inmates who are serving sentences for non-violent, non-drug offenses earn [good-conduct credits] at the rate of ten days per [month]." *Id.,* slip op. at 10.

We issued a writ of certiorari, on the Division's petition, to consider whether:

Corr. Servs. Article Sec. 3–704(b)(2)[,] which provides that an inmate whose term of confinement includes a sentence for a crime of violence or a drug crime is to receive good conduct credits at the rate of only five days per month over the term of confinement, permit[s] an award of ten good conduct credits per month on sentences in the term of confinement for non-violent, non-drug crimes?

*Stouffer v. Holbrook,* 413 Md. 228, 991 A.2d 1273 (2010). To the extent that "the general direction to aggregate multiple sentences into a single term of confinement" would "den[y] inmates the benefit of a law that the General Assembly intended be applicable to them," we shall affirm the judgment of the Court of Special Appeals. *Hutchinson,* 359 Md. at 330, 753 A.2d at 1029 (clarifying the holdings of *Md. House of Corr. v. Fields,* 348 Md. 245, 703 A.2d 167 (1997), and *Beshears v. Wickes,* 349 Md. 1, 706 A.2d 608 (1998)).

II.

We begin with a discussion of diminution credits. Diminution credits are credits which can be "earned by inmates to reduce the lengths of their confinements." *See, e.g., Frost v. State,* 336 Md. 125, 128, 647 A.2d 106, 107 (1994). "Assuming an inmate does not forfeit diminution credits as the result of a disciplinary hearing, the inmate can earn the right to be released on a date much sooner

than that designated by his or her original term of confinement." *Frost*, 336 Md. at 128, 647 A.2d at 108 (citations omitted). Once the inmate accumulates "sufficient credits to earn entitlement to release, the inmate is deemed released under 'mandatory supervision.' " *Id.*

*Fields*, 348 Md. at 261, 703 A.2d at 175. Under CS § 7–501(a), mandatory supervision is "a conditional release from confinement [granted] to an inmate who is serving a term of confinement of more than 18 months ... to the jurisdiction of the Division of Correction ... and [who] has served the term or terms, less diminution credit[s]."

There are four types of diminution credits: good-conduct, work (or industrial), educational, and special project credits. Art. 27, § 700 [now CS § 3–701 *et seq.*]; *see also Frost*, 336 Md. at 128, 647 A.2d at 107. Good-conduct credits, which are the subject of this appeal, are different from other diminution credits in that they are deducted "in advance from the inmate's term of confinement, subject to the inmate's future good conduct." Art. 27, § 700(d) [now CS § 3–704(a) ]; *see also Frost*, 336 Md. at 128, 647 A.2d at 107. Prior to October 1, 1992, inmates, upon incarceration, were prospectively awarded five days of good-conduct credits for each month of their sentence[, regardless of the nature of their sentence. Md. Ann.Code Art. 27, § 700(d)(2) (1957, 1992 Repl.Vol.) ].

*Fields*, 348 Md. at 261, 703 A.2d at 175–76.

In 1992, Art. 27, § 700 [now CS § 3–701 *et seq.*] was amended by Ch. 588 of the Acts of 1992. Under the amendment and its current iteration (Art. 27, § 700(d)(3) and CS § 3–704(b)(1)(ii), respectively), inmates may be awarded now ten, rather than five, good-conduct credits per month. If their term of confinement "includes a consecutive or concurrent sentence for a crime of violence ... or a crime of manufacturing, distributing, dispensing, or possessing a controlled dangerous substance," however, Art. 27, § 700(d)(2) (now CS § 3–704(b)(2)) limits their credits to five a month. At the Division's behest, the Legislature limited the amendment's impact,

making only those " 'terms of confinement imposed on or after October 1, 1992' " eligible for the more favorable rate. *Fields,* 348 Md. at 262, 703 A.2d at 176 (quoting Ch. 588 § 2 of the Acts of 1992).

The amendment did not alter, however, the definition of the phrase "term of confinement." It meant (and continues to mean) "the period from the first day of the sentence that begins first through the last day of the sentence that ends last...." CS § 3–701. We recognized in *Fields* that, when it enacted the 1992 amendment, "it appears ... the Legislature gave little thought to the definition of 'term of confinement'...." 348 Md. at 264, 703 A.2d at 177. The legislative history indicates only "that it was designed to ensure that inmates serving more than one sentence at a time [would] not receive good-conduct credits for more than one sentence." *Id.* at 264–65, 703 A.2d at 177 (citing legislative history of Ch. 354 of the Acts of 1991) (internal quotation marks omitted).

Although following the 1992 amendment the Legislature re-organized the Maryland Code, including re-organizing then-existing provisions of Article 27, into a new article entitled "Correctional Services," the substantive import of the provisions relevant to our analysis did not change.

## III.

We turn now to a survey of our interpretation and application of CS §§ 3–701 and 3–704(b)(2) in the relevant line of cases.

### A. *Fields*

*Fields* involved a defendant who was sentenced for daytime housebreaking and heroin possession in 1988. Before 1992, there was no difference in accrual rates for earning good-conduct credits—regardless of whether these offenses were non-violent and non-drug, a defendant received a maximum of five credits per month. Eventually, Fields earned release on mandatory supervision. It was revoked, however, when

Fields was convicted and sentenced in 1994 for theft and malicious destruction of property offenses.

The effective date of the 1992 legislative changes notwithstanding, the Division prevented Fields from earning the new rate of ten credits a month against his post–1992 nonviolent, non-drug offenses (*i.e.,* theft and malicious destruction of property). The Division argued that the amendment's favorable rate was reserved only for those "term[s] of confinement imposed on or after October 1, 1992." *See Fields,* 348 Md. at 263, 703 A.2d at 176 (referencing indirectly Ch. 588 § 2 of the Acts of 1992). Because Fields's term of confinement began before 1992, the Division claimed he was ineligible for the higher rate. Deeming the phrase "term of confinement" ambiguous, we found—"[i]n light of the legislative history of the 1992 amendment . . . [and] the applicability of the rule of lenity"—that not "all sentences that overlap or run consecutively must aggregate for all purposes to a single term of confinement." *Fields,* 348 Md. at 267–68, 703 A.2d at 178.

B. *Wickes*

The year following the filing of our opinion in *Fields,* we decided *Beshears v. Wickes,* 349 Md. 1, 706 A.2d 608 (1998). Like Fields, Wickes was serving a pre–1992 sentence when he was released on mandatory supervision, only to be re-incarcerated for post–1992 offenses. Unlike Fields, however, Wickes's pre–1992 sentence was for a violent crime (*i.e.,* rape).

In denying Wickes the more favorable good-conduct credit rate installed by the 1992 amendment, the Division did not rely upon the fact that Wickes's term of confinement was imposed pre–1992, similar to the position it took in *Fields.* Rather, it stressed the fact that Wickes's pre–1992 sentence was for a crime of violence. It combined Wickes's pre- and post–1992 sentences into a single term of confinement under the aggregation principle of Art. 27, § 700(a). Then, it disallowed Wickes from earning the more favorable rate under the limiting provision in Art. 27 § 700(d)(2) ("inmate[s] whose term[s] of confinement include[ ] a . . . sentence for . . . a

crime of violence...."). *Wickes,* 349 Md. at 4, 706 A.2d at 609. We disagreed with the Division, holding that Wickes was entitled to receive the more favorable rate for his post–1992 non-violent, non-drug sentences. Once again, we rejected the principle that " 'all sentences that overlap or run consecutively must aggregate for all purposes to a single term of confinement.' " *Wickes,* 349 Md. at 9, 706 A.2d at 612 (quoting *Fields,* 348 Md. at 267–68, 703 A.2d at 178).

### C. *Henderson*

Before *Wickes* was decided, the Division employed a unified approach to administering the good-conduct credits scheme. Under this approach, all sentences aggregated for all purposes into a single term of confinement. In *Wickes,* we disapproved of this approach, stating definitively that "[w]here a defendant is released on mandatory supervision and later commits and is sentenced for a new crime ... the new sentence and the old sentence ... do *not* aggregate to form one term of confinement for the purpose of [Art. 27] § 700 [ (now CS § 3–704(b)(2)) ]." *Wickes,* 349 Md. at 9, 706 A.2d at 612 (emphasis supplied).

A few months after *Wickes,* this Court was compelled to confront, in *Secretary of Public Safety and Correctional Services v. Henderson,* 351 Md. 438, 718 A.2d 1150 (1998), its holding in *Wickes.* Based on *Wickes,* the Division re-evaluated (and re-calculated) the sentence and release dates for "about 2,000 inmates serving multiple sentences, one or more of which was imposed before a release on mandatory supervision or parole and one or more of which was imposed for conduct occurring while the inmate was on mandatory supervision or parole." *Henderson,* 351 Md. at 446, 718 A.2d at 1154. After disaggregating the multiple sentences into two terms of confinement—before and after the release of the prisoners on mandatory supervision or parole—the Division determined that approximately ninety inmates had been released prematurely because of erroneous calculations of good-conduct credits. It deemed these inmates "escaped prisoner[s]." *Henderson,* 351 Md. at 447, 718 A.2d at 1155.

Henderson was one such prisoner. Originally, he was sentenced in 1975 for a conviction of robbery with a deadly weapon. Once paroled, he committed, and was convicted and sentenced for, a separate offense, possession of a controlled dangerous substance with intent to distribute. As both of his sentences—pre- and post-parole—were drug-related, he was "clearly . . . not eligible for the ten days a month good conduct credit." *Henderson,* 351 Md. at 446, 718 A.2d at 1154. The only saving grace of Henderson's predicament, as it turned out, was the aggregation principle. If the two ineligible sentences were aggregated, to the surprise of many, he could be released from prison earlier. Had *Wickes*'s holding—that pre- and post-release sentences be disaggregated—been followed, it would have worked against Henderson's interest.

We concluded—based on the plain meaning of the statute, in these circumstances—that the Division should have aggregated Henderson's sentences into a single term of confinement, leading to the earlier release date. We explained that *Wickes*'s "expanded 'holding' . . . was not necessary in order to reach the result in *Wickes.*" *Henderson,* 351 Md. at 451, 718 A.2d at 1157. Indeed, "all that we needed to say in *Wickes*" and "all that we said in *Fields* . . . was that all sentences that overlap or run consecutively do not need to aggregate *'for all purposes* to a single term of confinement.' " *Henderson,* 351 Md. at 451–52, 718 A.2d at 1157.

By enacting the diminution credit statute, the Legislature decided that qualifying prisoners should be accorded certain benefits. In *Fields* and *Wickes,* "[a]ggregation . . . [would have] denied [those] inmates a legislatively mandated benefit." *Henderson,* 351 Md. at 452, 718 A.2d at 1157. In *Henderson,* we "learn[ed]" that disaggregation may cause the same denial. *Henderson,* 351 Md. at 451–52, 718 A.2d at 1157. With the benefit of hindsight, we should have relied, as we had in *Fields,* upon the legislative history and the rule of lenity, as these "would have dictated the same result in *Wickes* . . . [and] *Fields* and also confined the [disaggregation approach] to those situations in which strict application of the . . . definition of 'term of confinement' would preclude inmates

from receiving the benefit of the 1992 [amendment]...." *Henderson,* 351 Md. at 445, 718 A.2d at 1154.

### D. *Hutchinson*

Just two years after *Henderson,* we decided the heretofore most recent diminution credit case decided by this Court, *Hutchinson.* Hutchinson was in and out of prison multiple times, beginning in 1970. Relevantly, in 1993, he was sentenced for a conviction of possession with intent to distribute heroin. Ultimately, he was released on mandatory supervision, but that relative freedom was short-lived. In 1996, he was convicted and sentenced for possession with intent to distribute cocaine.

Hutchinson argued for aggregation, claiming that his multiple sentences, imposed both before and after mandatory supervision, should constitute a single term of confinement for purposes of the diminution credit statute. *See Hutchinson,* 359 Md. at 327–28, 753 A.2d at 1028. His aim was to earn greater credits against his old, disqualifying sentence. *See id.* The Division disagreed, explaining that Hutchinson's approach would

> lead to the absurd result of an inmate who commits a new crime and receives a new sentence while on mandatory supervision serving less time upon revocation of the mandatory supervision than an inmate who does not commit a new crime and receives no new sentence but whose mandatory supervision is revoked for other reasons.

*Hutchinson,* 359 Md. at 328, 753 A.2d at 1028. The Division also relied upon the language of CS § 7–504(b) (now CS § 7–504(c)), which provided that "an inmate may not be awarded any new diminution credits after the inmate's mandatory supervision has been revoked." *Hutchinson,* 359 Md. at 327, 753 A.2d at 1028. The Division maintained steadfastly that CS § 7–504(b) meant "diminution credits *may* be awarded against a new sentence, but not until the 'old' sentence has been fully served." *Hutchinson,* 359 Md. at 327, 753 A.2d at 1025.

We rejected both parties' perspectives. Hutchinson's approach did not prevail because, despite CS § 7–504(b)'s ambiguity, one thing was clear—the "General Assembly did not intend for there to be any future diminution credits applied against the sentence(s) the inmate was serving when placed on mandatory supervision." *Hutchinson*, 359 Md. at 330, 753 A.2d at 1029. On the other hand, the "[Division's] position . . . would deny prisoners the full benefit of the laws," for inmates are "entitled to begin earning good conduct credits upon imposition of [new] sentence[s]. . . ." *Hutchinson*, 359 Md. at 331, 753 A.2d at 1029–30. As a result, the Division's position "fail[ed] to carry out the legislative intent" of the General Assembly's statutory scheme. *Hutchinson*, 359 Md. at 331, 753 A.2d at 1029.

To "fairly implement[ ]" the legislative intent, we held instead that "[p]risoners who receive a new sentence[ ] for conduct committed while on mandatory supervision should receive, and must be given, good conduct credits on that sentence[ ] as though there were no existing sentence[ ]." *Hutchinson*, 359 Md. at 331, 753 A.2d at 1030. "[W]ith respect to the existing sentence," however, the prisoner "gets no benefit from [good-conduct credits]. . . ." *Id.* Thus, [f]or purposes of applying CS § 7–504(b), "the existing sentence[ ] . . . and any new sentence[ ] . . . must be considered separately." *Hutchinson*, 359 Md. at 330–31, 753 A.2d at 1029.

We concluded our analysis by summarizing our good-conduct credits jurisprudence. In *Fields, Wickes,* and *Henderson,* we "learned" that:

[W]ith an increasing number of prisoners serving multiple sentences—some concurrent, some consecutive, some imposed at the same time, some imposed at different times, some imposed before certain legislative enactments affecting diminution credits, some imposed after those enactments—rules governing diminution credits will affect different prisoners in different ways. A construction that will benefit one group will often hurt another group. A result that appears quite reasonable in one circumstance may appear to be unreasonable in another.

*Hutchinson,* 359 Md. at 330, 753 A.2d at 1029. Faced with such uncertainty and lack of expertise, we walked in the footsteps of *Fields* and *Henderson* (and even *Wickes*[5]), relying upon for conclusive guidance the legislative intent embodied in the diminution credit statutory scheme. *See id.* ("The issue, ultimately, is one of legislative intent.").[6] If one thing is clear, it is that, "as in *Fields* and *Wickes* [,] we subordinate[ ] the general direction to aggregate multiple sentences into a single term of confinement when to do otherwise would ... den[y] inmates the benefit of a law that the General Assembly intended be applicable to them...." *Id.*

## IV.

 Viewing the context of the present case in light of our good-conduct credits jurisprudence,[7] the Division tries none-

5. In *Wickes,* we advanced two holdings. The first was that "whenever an inmate is released on mandatory supervision or parole and commits a new crime," the old and new sentences never aggregate, and it was broader than necessary. *Henderson,* 351 Md. at 451, 718 A.2d at 1157 (discussing *Wickes* ). The second (and remaining valid) holding was that the statute mandated "inmates be allowed ten ... credit[s] against sentences imposed on or after October 1, 1992 for non-violent, non-drug offenses" and that "to the extent ... the device of a single term of confinement ... frustrate[s] that direction," the rule of lenity is implicated and requires resolution in the defendant's favor. *Henderson,* 351 Md. at 451–52, 718 A.2d at 1157 (discussing *Wickes* ).

6. As explained *infra,* after *Hutchinson,* the General Assembly recodified CS § 7–504, adopting almost verbatim our interpretation of the awarding of good-conduct credits for old and new sentences. It is noteworthy that, while responding to *Hutchinson,* the Legislature did *not* disapprove of our conclusion that, for certain purposes, old and new sentences should be considered separately.

7. An examination of our jurisprudence reveals little debate about the proper standard of review for an inmate's habeas corpus challenge to a good-conduct credits decision by the Division. One of the few relevant cases, *Pollock v. Patuxent Institution Board of Review,* 374 Md. 463, 823 A.2d 626 (2003), involved an inmate who filed a habeas challenge to the Patuxent Institution Board of Review's revocation and subsequent non-renewal of his parole because of a positive urinalysis. After reciting our administrative standards of review, we upheld ultimately the Board's decision under the arbitrary and capricious standard of review. Here, there is some uncertainty as to whether the Division's revocation of 299 good-conduct credits should be characterized as an administra-

theless to persuade us that (1) the prior good-conduct credit cases are not controlling or even relevant, and (2) the plain language of CS § 3–704(b)(2)—the limiting provision—provides an easy and straightforward resolution. The Division is wrong.

### A. Prior Good–Conduct Credit Cases

No doubt the four seminal cases discussed *supra*—*Fields, Wickes, Henderson,* and *Hutchinson*—are factually and, in a few ways, legally distinct from the present case. These differences, however, are of no moment. Although the Division is correct that *Fields* and *Wickes* involved sentences imposed before and after 1992, that does not mean that their holdings apply only to similarly situated sentencing timelines. Moreover, while the Division is correct that *Hutchinson* involved a different (and uncontested) provision of the diminution statute than the present case, the Division ignores the fact that resolution of *Hutchinson* hinged on the legislative intent and previous caselaw associated with the statutory aggregation principle. In the final analysis, the distinctions underlying the Division's particular (and somewhat tortured) view of our cases in the present case are not material.[8]

### B. Ambiguity in the Application of CS § 3–704(b)(2)

Aside from its attempts to distinguish the present case from our prior cases, the Division asserts that this case identifies no

---

tive decision, legal interpretation, or something else. The parties do not brief this issue, however, presupposing instead that this case presents an agency's statutory interpretation. As the parties do not contest hotly this issue, we observe merely that assuming this *is* a matter of statutory interpretation and that the Division's decision is, therefore, entitled to some deference, our decision would remain the same.

**8.** In the present case at least, it is helpful to Holbrook's cause, but unnecessary for us to rely on the fact that, when Holbrook received his post-parole qualifying sentence, his pre-parole disqualifying sentence—for distributing cocaine—had expired. It would be entirely dispositive if the term of confinement had expired, but it had not—there were other active sentences keeping Holbrook under supervision. Moreover, it does not appear that our caselaw regarding the Legislature's intent turns upon (or stresses) this sort of fact.

ambiguity, for the controlling statutory provision—CS § 3–704(b)(2)—clearly limits the application of the more favorable rate to non-violent, non-drug terms of confinement. We disagree. We do not consider CS § 3–704(b)(2) in isolation. This case (like *Fields, Wickes, Henderson,* and *Hutchinson* ) requires us to consider CS § 3–704(b)(2)'s use of CS § 3–701's "term of confinement." In that endeavor, we remember that "statutory construction is approached from a 'commonsensical' perspective." *Fields,* 348 Md. at 265, 703 A.2d at 177 (quoting *Frost,* 336 Md. at 137, 647 A.2d at 112).

Turning to CS § 3–701, we mentioned earlier that "it appears the Legislature gave little thought to the definition of 'term of confinement' when it enacted Ch. 588 [the 1992 amendment]." *Fields,* 348 Md. at 264, 703 A.2d at 177. In fact,

> [a] Senate Judicial Proceedings Committee floor report explaining House Bill 1089, which changed the rate for awarding good-conduct credits, used the term *sentence* rather than *term of confinement* and stated that: "This bill may be applied prospectively only (*i.e.*[,] to persons *sentenced* on or after the effective date of the bill)." Shortly after the statute at issue was enacted, one of the sponsors of that bill, Delegate John Arnick, was asked to explain the bill. He stated: "If a person is *sentenced* before October 1, he is not eligible for the additional credits. A person *sentenced* on or after October 1 will receive the additional credits."

*Fields,* 348 Md. at 265, 703 A.2d at 177. Thus, while the legislation used the phrase "term of confinement," at the very least, a key legislator of the time equated it with "sentence." Common sense indicates, then, that the Legislature probably did not imbue the phrase with the broad application range that the Division suggests.

In determining whether "term of confinement" is ambiguous, we look to how it is used and applied. *See Fields,* 348 Md. at 266, 703 A.2d at 178 (" 'Statutes that are clear when viewed separately may well be ambiguous where their application in a given situation . . . is not clear.' ") (quoting *Gardner*

*v. State,* 344 Md. 642, 648, 689 A.2d 610, 613 (1997)). In *Fields,* the defendant challenged how the Division applied the phrase "term of confinement"—used in the clause restricting the more favorable rate to sentences imposed after 1992—to his situation. *See Fields,* 348 Md. at 252, 703 A.2d at 171. Although the present case involves how the Division applied "term of confinement" to a different set of facts, involving a different restricting clause (Ch. 588 § 2 of the Acts of 1992 versus CS § 3–704(b)(2)), we find ambiguity here for at least one of the same reasons relied on in *Fields*—the Legislature did not intend to make nonsensical distinctions.

Indeed, in *Fields,* we described the situation of a hypothetical inmate who receives a sentence before the 1992 amendment took effect, is released, and then commits another offense after the 1992 effective date. If he committed the post–1992 violation one day *before* mandatory probation expired on the pre–1992 offense, the Division would lump the former with the latter into one "term of confinement" and, thus, deny the inmate the more favorable rate, resulting in a much longer period of actual imprisonment. If the defendant committed the post–1992 violation one day *after* mandatory probation expired, however, he or she would be eligible for the 10–good–conduct–credits–a–month rate. For present purposes, we need only eliminate the focus on 1992—if Holbrook committed the subsequent offense one day *after* his probationary period expired, he would have a much shorter period of actual imprisonment than if he committed the offense one day *before* the expiration of his probationary period. Surely, "the [L]egislature did not indicate an intent to make such a nonsensical distinction." *Fields,* 348 Md. at 267, 703 A.2d at 178.

By applying the phrase "term of confinement" to the context of this case and CS § 3–704(b)(2), its meaning and purpose become only hazier. The Legislature simply did not foresee CS § 3–704(b)(2)'s application to Holbrook's situation, where a defendant receives multiple sentences, before and after being released on parole. If the General Assembly had any designs for the phrase "term of confinement," and the aggregation principle embodied therein, it was that "inmates

serving more than one sentence at a time [should] not receive good-conduct credits for more than one sentence." *Fields,* 348 Md. at 264, 703 A.2d at 177 (citing legislative history of Ch. 354 of the Acts of 1991). This does not clarify Holbrook's situation, as he seeks good-conduct credits on only one sentence, the second degree assault.

C. Legislative Intent and the Rule of Lenity in Situations like Holbrook's

Although in *Henderson* we said that "term of confinement" was not unclear or ambiguous, that was only because, "in [that] instance," "it d[id] not deprive Mr. Henderson ... of any legislatively created benefit." *Henderson,* 351 Md. at 452, 718 A.2d at 1157. Thus, while we should avoid making broad prophylactic proclamations about the applicability of the aggregation principle, we are able to say safely that where a statute mandates that a specific group of persons be given a benefit, but its application deprives that group of persons of the intended benefit, the statute may be unclear or ambiguous in application. That is the situation here. The Legislature mandated that inmates earn ten good-conduct credits a month, so long as their term of confinement did not include other sentences for certain ineligible, disqualifying offenses (those for violent or drug-related crimes)—*i.e.,* "inmates [should] be allowed ten ... credit[s] against sentences imposed on or after October 1, 1992 for non-violent, non-drug offenses...." *Henderson,* 351 Md. at 451, 718 A.2d at 1157 (discussing *Wickes* ).

At best, we might say that the Legislature intended that prisoners, like Holbrook, have their pre-parole and post-parole sentences considered separately, if thereby they may access the more favorable good-conduct credit rate. Indeed, such a construction avoids the nonsensical distinction described above, does not allow Holbrook to receive credits for more than one sentence (or term of confinement), and serves to advance the purpose of the statute—to relieve "prison overcrowding by moving non-violent [and, presumably, non-drug] offenders through the system at a faster pace" and to incentiv-

ize these kinds of offenders "to be on good behavior, because they will have more 'good-conduct' credits to lose if they cause trouble." Floor Report, Senate Judicial Proceedings Committee, H.B. 1089 (1992). Holbrook remains a drug offender for purposes of his pre-parole sentences and the subsequent violation of probation. For purposes of his post-parole sentences, however, the law may be said fairly to provide different treatment. Indeed, upon conviction of the subsequent second degree assault, Holbrook was sentenced first for violating probation and required to serve the remainder of his still-existing sentences. He *then* was sentenced for the separate, post-parole second degree assault and required to serve a separate sentence, which—in many ways—was independent from the original sentences and probation violation.

At worst, even if the Legislature did not intend such a result, it injected enough uncertainty into the statutory scheme, with respect to inmates in Holbrook's situation, to implicate the rule of lenity. The Legislature did not deny clearly to inmates like Holbrook receiving the more favorable rate, and, as a result, it is the Legislature, rather than affected inmates, who must bear the consequences. In any event, our approach is consistent with the Legislature's intent. After interpreting the phrase "term of confinement" in a series of cases, ending with *Hutchinson,* the Legislature did not disavow our reasoning or holdings. *See Williams v. State,* 292 Md. 201, 210, 438 A.2d 1301, 1305 (1981) ("The General Assembly is presumed to be aware of this Court's interpretation of its enactments and, if such interpretation is not legislatively overturned, to have acquiesced in that interpretation. This presumption is particularly strong whenever, after statutory language has been interpreted by this Court, the Legislature re-enacts the statute without changing in substance the language at issue.") (internal citations omitted). Rather, in a 2002 amendment to the diminution credit statutory scheme, the Legislature did quite the opposite:

BE IT FURTHER ENACTED, That it is the intent of the General Assembly that this Act shall be construed to be consistent with the ruling of the Court of Appeals of Mary-

land in *Public Safety v. Hutchinson,* 359 Md. 320[, 753 A.2d 1024] (2000), and construed to require that if an inmate is convicted and sentenced for a crime that is committed while the inmate is on mandatory supervision, any diminution credits that have been earned by the inmate prior to the date of the inmate's release on mandatory supervision are permanently revoked and eliminated and may not be applied to any previous, current, or future sentence or term of confinement of the inmate.

Ch. 485 § 1 of the Acts of 2002. In approving of our holding in *Hutchinson,* the Legislature agreed that, in certain instances, it is appropriate to "subordinate[ ] the general direction to aggregate multiple sentences into a single term of confinement" and to consider "the existing sentence[ ] . . . and any new sentence[ ] . . . separately," where "to do otherwise would . . . den[y] inmates a [legislatively mandated] benefit. . . ." *Hutchinson,* 359 Md. at 330–31, 753 A.2d at 1029. Indeed, in the language of the amendment itself, the Legislature seems to recognize as much, distinguishing clearly between "any previous, current, or *future* sentence, *or term of confinement* of the inmate.*"* Ch. 485 § 1 of the Acts of 2002 (emphasis added).

**█** Determining in what instances sentences should be considered separately is a difficult question. We may say, as we did in *Hutchinson,* however, that "[p]risoners who receive a new sentence[ ] for conduct committed while on mandatory supervision [or, in this case, parole] should receive, and must be given, good conduct credits on that sentence[ ] as though there were no existing sentence(s)." *Hutchinson,* 359 Md. at 331, 753 A.2d at 1030. We observe that these kinds of prisoners, who are treated as though they had no existing sentences, may earn those good-conduct credits at the more favorable rate, if none of their new sentences disqualifies them. Doing so accords with the Legislature's intent.

We go no further than that, limiting our reach to the facts of this case and those similarly situated. As we have "learned," "[a] result that appears quite reasonable in one

circumstance may appear to be unreasonable in another." *Hutchinson,* 359 Md. at 330, 753 A.2d at 1029.

Ordinarily, the Legislature entrusts the execution of its statutory scheme to the Division. In other words, the Legislature relies deliberately upon the Division and its expertise to navigate the "arcane world of diminution credits" and to fulfill, on a daily basis and at an individual level, its intent and purpose. *Hutchinson,* 359 Md. at 321, 753 A.2d at 1024. We appreciate the difficulty of that assignment.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE STATE.**